[No. F065532. Fifth Dist. Jan. 13, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
ALEJANDRO RODRIGUEZ LEON, Defendant and Appellant.

[No. F065533. Fifth Dist. Jan. 13, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL MENDOZA RIVAS, Defendant and Appellant.

[No. F065746. Fifth Dist. Jan. 13, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
VICTOR CENTENO, Defendant and Appellant.

[No. F066004. Fifth Dist. Jan. 13, 2016.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT PALOFOX, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I., II., III., IV., V., VII.B. and VII.C. of the Discussion.

COUNSEL

John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant Alejandro Rodriguez Leon.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Mendoza Rivas.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant Victor Centeno.

Cheryl Rae Anderson, under appointment by the Court of Appeal, for Defendant and Appellant Robert Palofox.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Brian G. Smiley and Laura Wetzel Simpton, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GOMES, J.**—Victor Centeno, Alejandro Rodriguez Leon (Leon), Robert Palofox, and Daniel Mendoza Rivas were tried together on charges of

conspiracy and other felonies arising from a series of home invasion robberies committed in the counties of Fresno and Merced in early 2010. Their trials were severed from those of alleged coconspirators with whom they were indicted in connection with these events. Centeno, Leon, and Palofox each received life sentences for their role in the conspiracy based on a jury's findings that the robberies were gang related. Gang allegations were found not true as to Rivas, who was sentenced to a total of 22 years in prison. We have consolidated the parties' individual appeals for purposes of briefing and decision.

Appellants allege error with respect to the admissibility of various evidence used at trial and the sufficiency of the evidence supporting certain convictions. The trial court's sentencing decisions are challenged on multiple grounds. There are also assertions of constitutionally deficient performance by trial counsel, as well as a claim that racial discrimination tainted the jury selection process. We affirm in part and reverse in part.

In the published portion of the opinion, we apply the California Supreme Court's recent decision in *People v. Elizalde* (2015) 61 Cal.4th 523 [189 Cal.Rptr.3d 518, 351 P.3d 1010] (*Elizalde*) to resolve challenges to evidence of gang affiliation admissions made by Centeno and appellants' coconspirators when they were booked into jail. We conclude any prohibited use of Centeno's admission was harmless error, and that the self-incriminating statements were not testimonial for purposes of the constitutional right to confront adverse witnesses. Our published discussion further holds that trial courts have discretion under Penal Code[1] section 669 to impose concurrent sentences for gang-related offenses punishable under the alternate penalty provisions of section 186.22, subdivision (b)(4).

## STATEMENT OF THE CASE

The underlying events occurred in February and March of 2010 when a group of people from Arizona, working in conjunction with an individual who lived in California, carried out a series of home invasion robberies in the cities of Atwater, Clovis, Kerman, and Selma. The crimes were carefully coordinated, sometimes involving upwards of 10 perpetrators, and followed the same general pattern. The men would split up into two groups of lookouts and intruders, with the former stationing themselves in parked cars at strategically selected locations and maintaining communication with the intruders over cell phones and walkie-talkies. The intruders, meanwhile, would enter homes and force the occupants inside to surrender cash, gold, and other items of value. Armed with guns, they threatened to kill their

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

victims and used violence to extract information about the location of money and valuables. The victims were sometimes tied up with electrical cords and other makeshift restraints. In three of the five incidents, an automobile was stolen during the course of the robbery.

A joint investigatory effort by law enforcement agencies in California and Arizona led to the arrest and prosecution of nine suspects. On March 22, 2011, a Fresno County grand jury returned an 18-count indictment against appellants and their accomplices, Gilbert Beltran, Christopher Escobedo, Estevan Landeros, Christian Rodriguez, and Eric Rodriguez. Count 1 of the indictment charged all parties with criminal conspiracy in violation of section 182, subdivision (a)(1). Leon and Rivas, along with coconspirators Estevan Landeros and Christian Rodriguez, were each charged in counts 2 through 18 for their respective roles in the five robberies. All parties, including Centeno and Palofox, were charged in counts 11 through 18 for their participation in the last two of those robberies. Centeno, who was 17 years old at the time of the offenses, was charged as an adult pursuant to Welfare and Institutions Code section 707, subdivision (d)(1).

Appellants were tried before a Fresno County jury in May and June 2012. A bifurcated trial was conducted on gang allegations that were made pursuant to section 186.22, subdivision (b). Trial evidence relevant to the claims on appeal is described within the body of our Discussion.

The first two robberies occurred on February 24, 2010, in Clovis and Atwater. For his part in the Clovis robbery, Rivas was convicted of robbery in concert (§§ 211, 213, subd. (a)(1)(A); count 2), false imprisonment by violence (§§ 236, 237; count 3), and using threats or violence to prevent or dissuade a victim from reporting a crime (§.136.1, subd. (c)(1); count 4). In relation to the Atwater robbery, Rivas was convicted of robbery in concert (count 5), assault by means likely to cause great bodily injury (§ 245, subd. (a)(1); count 6), false imprisonment by violence (count 7), and vehicle theft (Veh. Code, § 10851, subd. (a); count 8). He was also found guilty of conspiracy under count 1. Leon was convicted of conspiracy as well, but was acquitted on counts 2 through 8.

The third robbery took place in Kerman on March 15, 2010. For this incident, Leon and Rivas were convicted of robbery in concert (count 9) and false imprisonment by violence (count 10). As to Leon, the robbery was found to be gang related within the meaning of section 186.22, subdivision (b).

The fourth and fifth robberies occurred on March 16, 2010, in Atwater and Selma. For the (second) Atwater robbery, all appellants were convicted of

robbery in concert (count 11), false imprisonment by violence (count 12), assault with a semiautomatic firearm (§ 245, subd. (b); count 13), making criminal threats (§ 422; count 14), and vehicle theft (count 15). In regards to the Selma robbery, appellants were convicted of robbery in concert (count 16), false imprisonment (count 17), and vehicle theft (count 18). As to Centeno, Leon, and Palofox, the robberies were found to be gang related. Enhancement allegations for personal use of a firearm within the meaning of section 12022.5, subdivision (a) were found true as to Leon on counts 11 and 12.

Leon was sentenced to an aggregate term of 48 years to life in prison. For robbery in concert under counts 9, 11, and 16, he received consecutive terms of 15 years to life based on the alternate penalty set forth in section 186.22, subdivision (b)(4)(B). A consecutive three-year term was imposed for the gun enhancement attached to count 11. Concurrent terms were imposed for counts 14, 15, and 18, with all other sentences stayed.

Centeno and Palofox received sentences of 30 years to life in prison based on the gang-related robbery convictions on counts 11 and 16. Concurrent terms were imposed for counts 13, 14, 15, and 18. All other sentences were stayed.

Rivas was sentenced to a total of 22 years in prison as follows: The upper term of nine years under count 2 for robbery in concert, plus consecutive two-year terms (one-third of the middle term) for each robbery in concert conviction under counts 5, 9, 11 and 16, plus a consecutive three-year term for count 4, and a consecutive two-year term for count 13. Concurrent terms were imposed as to counts 8, 14, 15, and 18. Stayed sentences were imposed for all remaining counts.

## DISCUSSION

I.–V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### VI. *Gang Findings*

■ A bifurcated jury trial was conducted as to the gang-related allegations in counts 9, 11, and 16. Each of those counts involved the substantive offense of robbery committed within an inhabited dwelling house and in concert with two or more other persons (§§ 211, 213, subd. (a)(1)(A)). The

---

* See footnote, *ante*, page 1003.

gang allegations were made pursuant to section 186.22, subdivision (b), which provides for increased punishment when an offense is committed "for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (*Id.*, subd. (b)(1) and (4).) The jury's findings ultimately determined whether appellants received life sentences (Centeno, Leon, and Palofox) or a sentence for a term of years (Rivas).[8]

The prosecution argued that appellants knowingly committed the underlying offenses in association with members of a criminal street gang, and were therefore liable under section 186.22, subdivision (b) regardless of their personal gang affiliations or lack thereof. To support this theory, evidence was presented regarding admissions made by certain individuals during jail classification interviews that followed their arrest for the subject robberies, including those of third party accomplices/coconspirators Gilbert Beltran, Christopher Escobedo, Estevan Landeros, and Christian Rodriguez. Evidence of an admission made by Centeno during the jail intake process was introduced over an objection that it was obtained in violation of his *Miranda* (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*)) rights. Leon, Palofox, and Rivas each denied having gang ties during their own jail classification interviews, but the jury learned Palofox subsequently admitted his gang status in conjunction with a request to be transferred out of general population housing for safety reasons. The gang allegations were found true as to Centeno, Leon, and Palofox, but not true with respect to Rivas.

On appeal, Centeno renews his *Miranda* objection and summarily joins in arguments made by Leon. Leon's briefing challenges all of the prosecution's

[8] Most felonies committed for the benefit of, at the direction of, or in association with a criminal street gang are subject to the enhancement of an additional prison term ranging from two to 10 years. (§ 186.22, subd. (b)(1)(A)–(C).) However, if the gang-related crime is a "home invasion robbery," the defendant faces a sentence of 15 years to life. (*Id.*, subd. (b)(4)(B); see *People v. Jones* (2009) 47 Cal.4th 566, 571 [98 Cal.Rptr.3d 546, 213 P.3d 997] (*Jones*).) Section 186.22, subdivision (b)(4)(B) is not an enhancement, but rather an "alternate penalty provision," meaning it sets forth an alternate penalty for the underlying offense if the jury finds the conditions specified in the provision have been satisfied. (*Jones, supra*, 47 Cal.4th at p. 576.) Standing alone, a home invasion robbery conviction carries a maximum sentence of nine years in prison. (§ 213, subd. (a)(1)(A).) If the offense is found to be gang related within the meaning of section 186.22, the punishment is life in prison with a minimum parole eligibility period of 15 years. (§ 186.22, subd. (b)(4)(B).)

We note the indictment actually cited to section 186.22, subdivision (b)(1), which is an enhancement provision, and made no reference to subdivision (b)(4)(B). Appellants do not allege prejudice in this regard, and thus impliedly acknowledge that they received adequate notice of their potential exposure to a life sentence under the alternate penalty provision. (See § 960; *People v. Thomas* (1987) 43 Cal.3d 818, 826–827 [239 Cal.Rptr. 307, 740 P.2d 419] [failure to cite the correct code section is inconsequential if the accusatory pleading alleges all facts necessary to establish its applicability].)

jail classification evidence on grounds that its admission contravened *Miranda* principles and resulted in a violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. In a related argument, Leon contends that the prosecution introduced testimonial hearsay through the opinions of its gang expert in violation of his constitutional right to confront adverse witnesses. Palofox summarily joins in the positions taken by Centeno and Leon.

■ During the pendency of this appeal, the California Supreme Court issued its decision in *Elizalde*, which addresses and resolves the *Miranda* issue raised by Centeno. It is now settled that the Fifth Amendment right against self-incrimination is implicated when law enforcement officers ask "routine questions about gang affiliation" while processing a defendant into jail. (*Elizalde, supra*, 61 Cal.4th at p. 527.) As will be explained, the admission of evidence concerning Centeno's jail classification statements was erroneous under *Elizalde*. The more difficult question is whether the error was prejudicial, and the answer depends in part on the admissibility of the statements made by accomplices/coconspirators who were not parties to the case. We conclude appellants do not have standing to assert the constitutional rights of those third parties, nor could they have asserted their own Sixth Amendment confrontation rights as a basis for excluding evidence of the third party admissions. Given the significance of the accomplices' self-incriminating statements in combination with other admissible evidence presented at trial, the violation of Centeno's *Miranda* rights did not constitute reversible error.

*Additional Background Information*

Trial of the gang allegations began with a hearing conducted pursuant to Evidence Code section 402 in regards to Centeno's jail classification admissions. The trial court had previously advised defense counsel of its belief that the law was "fairly settled" in terms of there being "no grounds for arguing that there's some kind of Fifth Amendment violation" in the use of such evidence. Each defendant was given the opportunity to argue otherwise, but only Centeno chose to do so. Relying on pre-*Elizalde* case law, the trial court ruled that Centeno's statements during the jail intake process were admissible.

The prosecution's case-in-chief included testimony by correctional officers from the Fresno County Jail. Witness Cynthia Diaz described herself as a "jail classification officer" or "population management officer." Her duties involved placing inmates in the appropriate custodial setting based on their responses to a standardized intake interview. The process required interviewees to answer questions listed on a preprinted form, including, "Do you

associate with any street/prison gangs? If yes, explain." All inmates were required to review and sign their completed form.

Officer Diaz conducted two classification interviews with Estevan Landeros. She observed and documented the presence of tattoos on his body of the words "South Side" and of three dots grouped together in a triangular pattern. Recognizing the tattoos as being indicative of a connection to the "Sureno" gang, Officer Diaz was skeptical when Landeros initially denied being a gang member or associate. During the second interview, she advised him that he needed to answer the gang association question truthfully for his own safety. At trial she explained: "If he denied then I would have to put him in general population, [where] we have rival gangs and he would be assaulted." The majority of inmates in general population housing were members of the regional "Bulldogs" gang, which viewed the Surenos as a rival group. Landeros eventually informed Officer Diaz that he "associated with the Surenos."

The correctional officer who interviewed Centeno testified that he admitted to being a "Sureno from Phoenix." Christian Rodriguez similarly identified himself as a "Phoenix Sureno" during his jail classification interview. Christopher Escobedo admitted to being a "South Side associate from Phoenix," and Gilbert Beltran claimed to be a "South Sider from Phoenix." Beltran and Escobedo were noted to have tattoos of the letters "SS." Escobedo reportedly obtained a three-dot tattoo subsequent to his admission into the jail.

Detective Andrew Simonson of the Fresno County Sheriff's Department testified as the prosecution's gang expert. He explained, based on his training and experience, that the Sureno criminal street gang is controlled by a prison gang known as the "Mexican Mafia." Since most members of the Mexican Mafia are "locked down in protective housing units throughout the state and federal system," they rely on the Surenos to act as their "foot soldiers" outside of prison, generating money for the organization through criminal activity.

The Surenos have a nationwide presence and commonly identify with certain words and symbols. The name itself translates to "southerner," and terms such as "sur" (meaning "south") "south side" or "south sider" are often used to indicate a Sureno affiliation. The number 13 has significance to Surenos because the 13th letter of the alphabet is "M," which to them connotes the Mexican Mafia. Gang members will display the number 13 using Roman numerals or a symbol from the Mayan numbering system of two horizontal lines underneath three dots. According to Detective Simonson, the most common tattoo used by Surenos to signify their membership is three dots grouped together in a triangular pattern.

Detective Simonson opined that appellants and their accomplices were all Sureno members or associates. His opinions with respect to the accomplices were primarily based on their admissions during jail classification interviews. The expert stressed that he considered such admissions to be the most reliable form of evidence to determine gang affiliation ("For us it's basically a stand-alone criteria."). As a practical matter, gang members are motived by "self-preservation" to answer jail classification questions truthfully because "[t]hey don't want to be placed in housing with rival gang members where they can be killed [or] assaulted." Falsely claiming association with a particular gang can also be deadly. In Detective Simonson's experience, the occupants of a segregated Sureno "pod" will assault or kill non-Surenos if such individuals are housed with them.

Leon denied having gang ties during his classification interview and was accordingly housed in a minimum security location. Nevertheless, Detective Simonson believed Leon was a Sureno "associate." The expert had personally participated in the execution of a search warrant at Leon's residence in Arizona, and had observed distinctive gang graffiti displayed in various locations on the property. He testified to seeing the number 13 carved into trees near the trailer in which Leon was living, and, in other locations, the three-dot imagery, the words "South Side" and "Hayden Park," and the letters "SS" and "VHPLS." The letters VHPLS purportedly stood for "Vario Hayden Park Locos," a Phoenix area subset of the Surenos. Photographs of the graffiti were admitted into evidence.

The expert's opinions about Leon were further based on his review of police reports and other information provided to him by members of the Phoenix Police Department. According to those sources, Leon had previously been seen wearing gang clothing and was known to associate with Estevan Landeros. Phoenix police believed Landeros and Leon were both part of the Vario Hayden Park Locos.

As to Centeno, the expert relied on "jail classifications as well as Phoenix Police reports." These records indicated that Centeno had gang tattoos and belonged to a Sureno subset known as the "Vario Happy Homes Locos." He was also known to associate with Palofox and Gilbert Beltran.

On direct examination, Detective Simonson opined that Palofox was a Sureno member based upon his review of "the Phoenix Police reports as well as local classification documents." On cross-examination, Palofox's attorney elicited testimony from the expert regarding his client's denial of gang membership during a classification interview at the Fresno County Jail—information not previously disclosed in front of the jury. Defense counsel also successfully moved to have Palofox's signed jail classification questionnaire

admitted into evidence. This line of questioning led to the revelation that Palofox had later requested to be transferred from general population housing out of fear for his safety: "Originally he was placed with Bulldogs. He was—he told the CO that the Bulldogs overheard him talking to his family and stated he slipped. And then he admitted to the classification officers that he was a South Sider and he no longer [felt] comfortable housed with any Bulldogs."

Finally, with respect to Rivas, the expert acknowledged there was no evidence to indicate he was a gang member. Detective Simonson believed Rivas had associated with gang members through his involvement with the codefendants and other accomplices, but conceded there was no evidence Rivas actually knew those individuals were members of a gang. As stated above, the gang allegations against Rivas were found not to be true.

*The* Elizalde *Decision*

In *Elizalde*, the California Supreme Court considered "whether routine questions about gang affiliation, posed to [a] defendant while processing him into jail on murder charges, come within *Miranda*'s well-recognized booking exception." (*Elizalde, supra*, 61 Cal.4th at p. 527.) The key holding of the opinion is as follows: "Gang affiliation questions do not conform to the narrow exception contemplated in [*Rhode Island v. Innis* (1980) 446 U.S. 291 [64 L.Ed.2d 297, 100 S.Ct. 1682]] and [*Pennsylvania v. Muniz* (1990) 496 U.S. 582 [110 L.Ed.2d 528, 110 S.Ct. 2638]] for basic identifying biographical data necessary for booking or pretrial services. Instead, they must be measured under the general *Innis* test, which defines as 'interrogation' questions the police should know are 'reasonably likely to elicit an incriminating response.' " (*Elizalde, supra*, 61 Cal.4th at p. 538.) Whether or not a gang-related inquiry by jail personnel requires a *Miranda* admonition will depend on the nature of the charges the inmate is facing.

The *Elizalde* defendant was asked gang affiliation questions by sheriff's deputies who were aware he had been charged with murder but did not know the offense was gang related. (*Elizalde, supra*, 61 Cal.4th at p. 529.) Ignorance of the latter circumstance was immaterial because murder is "a crime frequently committed for the benefit of criminal street gangs, and a qualifying offense establishing a ' "pattern of criminal gang activity" ' " for purposes of section 186.22. (*Elizalde*, at p. 540.) Therefore, the questions were likely to elicit an incriminating response and needed to be prefaced with a *Miranda* admonition, "even if the deputies' subjective intention was benign." (*Ibid.*) "While officers were permitted to ask these questions for institutional security purposes, defendant's un-*Mirandized* responses were inadmissible against him during the [prosecution's] case-in-chief." (*Id.* at p. 527.)

Under *Elizalde*, Centeno's objection to the admission of his jail classification statements should have been sustained. The jail classification officer who interviewed him knew of his connection to the other inmates from Arizona, and the record indicates the officer would have also been aware of his charges. As discussed in footnote 8, *ante*, robbery in concert in violation of section 213, subdivision (a)(1)(A) is subject to punishment under the alternate penalty provision in section 186.22, subdivision (b)(4)(B). These circumstances made it reasonably likely that the gang affiliation question would elicit an incriminating response, and a *Miranda* admonishment was therefore required.

■ Palofox's situation does not fit squarely within the parameters of the *Elizalde* decision. It appears he approached correctional officers on his own accord and volunteered information about his gang status in conjunction with a request for alternate housing arrangements. The record does not demonstrate that his admission was the product of interrogation. He has made no effort to argue this issue on appeal, and we will not endeavor to make arguments on his behalf. (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 364 [178 Cal.Rptr.3d 185, 334 P.3d 573] [although joinder of claims is broadly permitted, " 'each appellant has the burden of demonstrating error and prejudice' "].) Under current law, a gang expert's opinion may be based on hearsay, and when testifying, he or she may describe the material that forms the basis for their opinion. (*People v. Gardeley* (1996) 14 Cal.4th 605, 618 [59 Cal.Rptr.2d 356, 927 P.2d 713].) We therefore assume Detective Simonson's testimony in regards to Palofox's admission was permissible.

*Due Process Considerations*

Leon claims his due process rights were violated by the admission of evidence of his coconspirators' jail classification statements. He argues those statements were coerced in that each person faced a Hobson's choice of providing self-incriminating information or jeopardizing their personal safety by being housed with rival gang members. Leon further alleges ineffective assistance of counsel based on his trial attorney's failure to make these arguments below.

■ "It is settled that the accused has no standing to object to a violation of another's Fifth Amendment privilege against self-incrimination." (*People v. Badgett* (1995) 10 Cal.4th 330, 343 [41 Cal.Rptr.2d 635, 895 P.2d 877] (*Badgett*).) However, a defendant does have limited standing to assert that his own due process right to a fair trial has been violated through the admission of improperly obtained statements made by a third party. (*People v Williams* (2010) 49 Cal.4th 405, 452 [111 Cal.Rptr.3d 589, 233 P.3d 1000] (*Williams*); *People v. Jenkins* (2000) 22 Cal.4th 900, 966 [95 Cal.Rptr.2d 377, 997 P.2d

1044] (*Jenkins*).) This relatively uncommon issue has arisen in the context of a challenge to coerced trial testimony, and in relation to the "fruits" of a third party's involuntary out-of-court statements. (*Williams, supra,* 49 Cal.4th at pp. 452–454; *Jenkins, supra,* 22 Cal.4th at pp. 966–967; *Badgett, supra,* 10 Cal.4th at pp. 342–348; *People v. Douglas* (1990) 50 Cal.3d 468, 501–505 [268 Cal.Rptr. 126, 788 P.2d 640]; *People v. Varnum* (1967) 66 Cal.2d 808, 811–813 [59 Cal.Rptr. 108, 427 P.2d 772].) Leon cites to most of these cases in his briefs, but provides no further authority regarding due process challenges to the type of evidence at issue here.

"The violation of a third party's privilege against self-incrimination may deprive a defendant of his or her due process rights if such action adversely affects the reliability of testimony offered against the defendant at trial." (*Jenkins, supra,* 22 Cal.4th at p. 966.) "[W]hen the defendant's claim is based upon the involuntariness of a third party's statement, the exclusionary rule applicable to a claimed violation of the privilege against self-incrimination does not apply. [Citation.] Rather, the defendant may prevail only by demonstrating fundamental unfairness at trial, normally by establishing that evidence to be produced at trial was made unreliable by coercion." (*Ibid.*; see *Badgett, supra,* 10 Cal.4th at p. 348 ["Testimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony."].)

Respondent argues there is no due process violation under the framework set forth in cases such as *Jenkins* and *Badgett* because the circumstances in which the statements of Leon's coconspirators were made, and the independent evidence of their gang affiliations, overwhelmingly demonstrate that the admissions were reliable. Leon does not disagree with the reliability argument, but submits that a due process violation should be found because the third party admissions were procured by "outrageous police misconduct." We find respondent's argument to be more persuasive given the authorities upon which the parties have relied. The *Elizalde* decision may inevitably lead to future claims that even *Mirandized* jail classification admissions are inherently coercive, but we need not resolve that issue in order to dispose of Leon's current claim. The ineffective assistance claim fails pursuant to the foregoing analysis and given the state of the law at the time of trial. (See *People v. Welch* (1993) 5 Cal.4th 228, 237 [19 Cal.Rptr.2d 520, 851 P.2d 802] ["Reviewing courts have traditionally excused parties for failing to raise an issue at trial where an objection would have been futile or wholly unsupported by substantive law then in existence."].)

*Sixth Amendment Considerations*

Leon alleges a violation of his Sixth Amendment rights under *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). Two categories of evidence are relevant to his claim. He describes the first category as "hearsay evidence from Phoenix police," referring to the documents and verbal information Detective Simonson obtained from Arizona law enforcement officers and relied upon in forming his expert opinions. The second category is comprised of the jail classification admissions of his codefendants and third party accomplices.

■ "The confrontation clause of the Sixth Amendment to the federal Constitution, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.' The right of confrontation includes the right of cross-examination." (*People v. Fletcher* (1996) 13 Cal.4th 451, 455 [53 Cal.Rptr.2d 572, 917 P.2d 187].) In *Crawford*, the United States Supreme Court held that the confrontation clause bars the admission of out-of-court testimonial hearsay statements except when "the declarant is unavailable . . ." and the defendant "had a prior opportunity to cross-examine" the declarant. (*Crawford, supra*, 541 U.S. at p. 59.)

The issue of whether a defendant's Sixth Amendment right to confrontation is violated by a gang expert's reliance on testimonial hearsay is currently pending before the California Supreme Court. (*People v. Sanchez*, review granted May 14, 2014, S216681; *People v. Archuleta*, review granted June 11, 2014, S218640 [briefing deferred pending consideration and disposition of *Sanchez*]; *People v. Eberhart*, review granted Nov. 24, 2015, S229864 [same].) We decline to speculate as to how the issue will be decided, and conclude the verdict in this case would have been the same even without Detective Simonson's testimony regarding the contents of Phoenix police reports and his conversations with out-of-state law enforcement officers. (See further discussion, *post*.) The outcome would likely have been different if appellants' Sixth Amendment rights were implicated by evidence of their accomplices' jail classification admissions, but for the reasons that follow we conclude those admissions were not "testimonial" for purposes of *Crawford*.

■ In *Elizalde*, our Supreme Court determined that jail classification interviews are a form of custodial interrogation for purposes of the Fifth Amendment insofar as the questioning is likely to elicit an incriminating response. (*Elizalde, supra*, 61 Cal.4th at pp. 531, 538–539.) However, while responses to such interrogation may be considered "testimonial" in a Fifth Amendment context, the same is not necessarily true for purposes of the Sixth Amendment. (*Elizalde*, at p. 532, fn. 7.) The *Elizalde* opinion contains a

footnote on this point that states, in pertinent part: "This case in no way implicates the court's *Crawford* jurisprudence." (*Ibid.*)

The *Crawford* opinion does not define the term "testimonial," but says it "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." (*Crawford, supra,* 541 U.S. at p. 68.) As originally decided, *Crawford* left no room for debate over the last category: "Statements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." (*Id.* at p. 52.) The high court revised its position in *Davis v. Washington* (2006) 547 U.S. 813 [165 L.Ed.2d 224, 126 S.Ct. 2266] (*Davis*) to make an exception for emergency situations. The *Davis* case instructs that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Davis, supra,* 547 U.S. at p. 822.) This aspect of the opinion has come to be known as the " 'primary purpose' " test. (*Ohio v. Clark* (2015) 576 U.S. ___ [192 L.Ed.2d 306, 135 S.Ct. 2173, 2179] (*Clark*).)

Since *Davis*, the United States Supreme Court has adopted the view that "not all those questioned by the police are witnesses" for purposes of the Sixth Amendment and not all " 'interrogations by law enforcement officers,' [citation], are subject to the Confrontation Clause.' " (*Michigan v. Bryant* (2011) 562 U.S. 344, 355 [179 L.Ed.2d 93, 131 S.Ct. 1143] (*Bryant*), quoting *Crawford, supra,* 541 U.S. at p. 53.) Hearsay evidence must now satisfy the primary purpose test in order to be considered testimonial for purposes of the Sixth Amendment right to confront and cross-examine adverse witnesses. (*Clark, supra,* 576 U.S. at p. ___ [135 S.Ct. at p. 2180]; *People v. Chism* (2014) 58 Cal.4th 1266, 1288–1289 [171 Cal.Rptr.3d 347, 324 P.3d 183].) In its current formulation, the test asks whether the statement at issue was "procured with a primary purpose of creating an out-of-court substitute for trial testimony." (*Bryant, supra,* 562 U.S. at p. 358.) The California Supreme Court has described the test in substantially similar terms: "First, to be testimonial the statement must be made with some degree of formality or solemnity. Second, the statement is testimonial only if its primary purpose pertains in some fashion to a criminal prosecution." (*People v. Dungo* (2012) 55 Cal.4th 608, 619 [147 Cal.Rptr.3d 527, 286 P.3d 442].)

The primary purpose test is essentially a totality of the circumstances analysis. "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that

reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." (*Bryant, supra*, 562 U.S. at p. 360.) "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " (*Clark, supra*, 576 U.S. at p. ___ [135 S.Ct. at p. 2180].) " 'Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause.' " (*Ibid.*)

■ Here, the statements in dispute were made with a sufficient degree of formality. However, we cannot conclude the primary purpose of those statements—from the perspective of either the person asking the questions or the person answering them—was to create an out-of-court substitute for trial testimony or to otherwise contribute to a criminal investigation or prosecution. Nothing suggests that Leon's codefendants and third party accomplices disclosed gang membership or affiliation for the purpose of making a confession against themselves or an accusation against someone else. Likewise, based on all of the available evidence, including testimony by the correctional officers who appeared at trial, we are convinced the *primary* purpose for the gang affiliation questions was to further institutional security objectives, i.e., to ensure the safety of inmates and jail personnel. The answers to those questions also had evidentiary value from a prosecutorial standpoint, but the objective primary purpose "reasonable participants would have had" in this context was not the creation of an out-of-court substitute for trial testimony. (*Bryant, supra*, 562 U.S. at p. 360.) Therefore, appellants did not have a Sixth Amendment right to cross-examine each other or their accomplices about the jail classification admissions.

*Prejudice*

The erroneous admission of a jail classification statement obtained in violation of *Miranda* is reviewed for prejudice under the standard articulated in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*Elizalde, supra*, 61 Cal.4th at p. 542.) The People must show, beyond a reasonable doubt, that the error did not contribute to the jury's verdict. (*Ibid.*) " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' [Citation.] Thus, the focus is what the jury actually decided and whether the error might have tainted its decision." (*People v. Neal* (2003) 31 Cal.4th 63, 86 [1 Cal.Rptr.3d 650, 72 P.3d 280].) The error in *Elizalde* was found to be harmless because the defendant's gang connections were established through independent evidence.

Focusing on what the jury actually decided in this case, we cannot ignore its findings as to Rivas. Both Leon and Rivas denied having gang ties during their jail classification interviews, but only Rivas was exonerated. Rivas stood apart from his coconspirators as the only member of the conspiracy from California. The other men resided in or around Phoenix, Arizona. Rivas's only apparent connection to the group was that he had dated Estevan Landeros's sister during the relevant time period. When Rivas took the stand in the first phase of trial, he denied having any involvement in the robberies and claimed to be barely acquainted with Landeros.

■ A trier of fact can rationally infer a crime was committed "in association" with a criminal street gang within the meaning of section 186.22, subdivision (b) if the defendant committed the offense in concert with gang members. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [5 Cal.Rptr.3d 615].) "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a gang; the statute requires only the specific intent to promote, further, or assist criminal conduct by gang members." (*People v. Albillar* (2010) 51 Cal.4th 47, 67 [119 Cal.Rptr.3d 415, 244 P.3d 1062], italics omitted.) Rivas was convicted of participating in all five robberies, and there was overwhelming evidence that the crimes were committed in association with gang members, yet the jury found the section 186.22, subdivision (b) allegations not true. Assuming jurors followed the instructions they were given, the only logical explanation for this outcome is that they believed Rivas did not actually know his accomplices were members of a gang. In assessing the potential for prejudice in the admission of Centeno's jail classification statements, we must consider whether the absence of such evidence could have raised similar doubts as to Leon, Centeno, and/or Palofox.

Only Leon and Rivas were convicted on count 9, i.e., the robbery which took place in Kerman on March 15, 2010. Because Centeno was not accused of participating in this offense, it stands to reason that his jail classification statements did not impact the jury's findings with respect to Leon on that count. Since the jury impliedly found Rivas was neither a gang member nor gang associate, it would appear Leon's culpability under section 186.22 was based on his association with the third party accomplices, most likely Estevan Landeros and Christian Rodriguez. Numerous victims had identified Landeros and Rodriguez to police and/or during their trial testimony, and both men were alleged to have participated in all five robberies.

Cell phone evidence showed Leon was in contact with Landeros during the course of the conspiracy. Eyewitness testimony also placed Leon and Landeros together on various dates. Their connection to one another was sufficiently established even without the information contained in the Phoenix police

reports, which certainly reinforced the other evidence of Leon's gang ties. Unlike with Rivas, Leon's familiarity with the Surenos could be inferred from the gang graffiti displayed outside of his residence. The graffiti evidence was based on Detective Simonson's personal observations rather than hearsay, and the corresponding photographs were admitted at trial. In summary, the record demonstrates beyond a reasonable doubt that the gang finding for Leon on count 9 would have been the same with or without evidence of Centeno's jail classification admission.

Counts 11 and 16 respectively pertained to the robberies in Atwater and Selma on March 16, 2010. Since each appellant was convicted of these crimes, Palofox's admission of gang membership effectively forecloses any claims of prejudice by Leon and Centeno. As to them, the section 186.22 findings were further substantiated by the admissions of their coconspirators, most of whom were further shown to be Sureno members through evidence of their gang tattoos. Cell phone records indicated that Centeno had calls on March 16, 2010, to or from phones associated with Gilbert Beltran, Christopher Escobedo, and Christian Rodriguez. His phone was in regular contact with a number associated with Christian Rodriguez during February and March of that year. Thus, even without evidence of his jail classification admission, it was firmly established that Centeno committed counts 11 and 16 in association with gang members and with the intent to further or assist in the conduct of gang members.

Palofox's gang findings were established through his own admissions and by evidence of codefendant Leon's gang associations. The victim of the count 11 robbery had also identified Estevan Landeros and Christian Rodriguez as being among the perpetrators who entered his home, thus removing any doubt about the gang-related nature of that offense. The count 16 findings were further established by evidence of Gilbert Beltran's involvement. Beltran pawned a ring that was stolen during this robbery after the group returned to Arizona. Palofox was reportedly living with Beltran at the time of his arrest, and the jury heard recordings of a discussion between Palofox and Beltran in which both incriminated themselves. For all of these reasons, it is evident beyond a reasonable doubt that the jury's verdict was not tainted by the erroneous admission of Centeno's jail classification statements.

VII. *Sentencing*

A. *Consecutive Sentences for Gang-related Home Invasion Robberies*

Centeno, Leon, and Palofox received consecutive sentences of 15 years to life for their gang-related robbery convictions pursuant to the trial court's conclusion that such punishment was mandatory under the holding of

*People v. Felix* (2000) 22 Cal.4th 651 [94 Cal.Rptr.2d 54, 995 P.2d 186] (*Felix*). As a result, Leon's convictions on counts 9, 11, and 16 resulted in an aggregate term of 45 years to life in prison. Centeno and Palofox each received sentences of 30 years to life for their convictions on counts 11 and 16. On appeal, Centeno and Palofox argue the trial court misconstrued the *Felix* decision and acted under a mistaken belief that it had no discretion to impose concurrent sentences for any of the robbery convictions. Leon summarily joins in this claim.

The Attorney General submits that the issue is forfeited as a result of appellants' failure to object at the time of sentencing. However, she impliedly concedes the merits of appellants' argument by urging us to find, to the extent the claim is reviewable, that "the trial court fully understood its discretionary power" and "properly exercised its discretion to select consecutive sentences." We conclude appellants have carried their burden of establishing error.

Regarding forfeiture, the error complained of may fall within a narrow class of sentencing issues that are reviewable in the absence of a timely objection. " 'Failure to exercise a discretion conferred and compelled by law constitutes a denial of a fair hearing and a deprivation of fundamental procedural rights, and thus requires reversal. [Citations.]' [Citation.] Where, as here, a sentence choice is based on an erroneous understanding of the law, the matter must be remanded for an informed determination." (*People v. Downey* (2000) 82 Cal.App.4th 899, 912 [98 Cal.Rptr.2d 627].) In any event, we would exercise our discretion to resolve the claim in the interests of fairness and judicial economy, since the matter is already being remanded for other sentencing matters, and to forestall unnecessary ineffective assistance of counsel claims. (See *People v. Williams* (1998) 17 Cal.4th 148, 161–162, fn. 6 [69 Cal.Rptr.2d 917, 948 P.2d 429]; *People v. Lewis* (1990) 50 Cal.3d 262, 282 [266 Cal.Rptr. 834, 786 P.2d 892].)

1. *Background*

At Leon's sentencing hearing, defense counsel made statements regarding the anticipated length of his client's sentence given the section 186.22, subdivision (b) findings. Following a response by the prosecutor, the trial court said: "*People* [*v.*] *Felix*, 22 Cal.4th 651 [94 Cal.Rptr.2d 54, 995 P.2d 186] in 2000. California Supreme Court directly concluded that indeterminate terms of this nature must be served fully consecutive to each other . . . . We all fully understand it whether we agree with it or not. When I say 'we,' I mean the defense, not necessarily the court." Later, during the pronouncement of sentence, the court stated: "I'm ordering you committed to the Department of Corrections on count—each of these counts Nine, Eleven, and Sixteen as

required by law to the term of 15 years to life. Each of those 15[-]year-to-life terms to run consecutive to each other as pursuant to the case authority that I just referenced here on the record."

While sentencing Centeno, the trial court indicated that it would have been inclined to grant him leniency if it had discretion to do so. The relevant statements were as follows:

"The issue, of course, is what sentence the court should impose. And it seems to me I would agree with the prosecution that in light of everything that I've read here, that the court really does not have authority to do otherwise but to impose the sentences with respect to Counts Eleven and Sixteen. But I want to say, in fairness to Mr. Centeno here, and to some future court evaluating this, that if the court believed and understood that it did have the authority to exercise discretion, I might. I might have done that with respect to Mr. Centeno, primarily because of his age and his involvement with a lot of other adults who certainly should have known better.

"And so, you know, I think I want to make—leave that door open here, because I don't know what the Appellate Court might do in the future on this subject. But this is a situation where, given his limited involvement in this matter and his age as a minor—that's the most important thing in this court's view, being a minor at the time of the commission of these crimes—that the court might have exercised its discretion to do other than impose life terms on this case. But in the court's view, for the reasons that counsel here from the People have a cited authority which is primarily the case of [*People v. Jones, supra*, 47 Cal.4th 566] [the] California Supreme Court has made it clear that sentencing for the crime of robbery in concert, you know, in a home invasion robbery scenario for gang purpose, which is what the jury found to be true here, that that's not an enhancement. And in this court's view, therefore, is not subject to relief under [section] 186.22(g) that the defense has asked the court to make—grant a motion to strike. This is, in fact, an alternate sentence for this crime. And the court has no authority but to impose that alternate sentence.

"And under the cases that I think I've cited earlier, and I'll make reference to now, which is *People* [v.] *Felix*, that's 22 Cal.4th 651, F-E-L-I-X, that's a 2000 decision of the California Supreme Court, Mr. Lindahl. 22 Cal.4th 651. Essentially, what that says is where there is separate home invasion robberies they are required to be served fully consecutive—mandatory full consecutive terms . . . . [T]he mandatory sentence, the only sentence this court can impose is 30 years to life."

The trial court referenced *Felix* yet again during the pronouncement of sentence for Palofox: "I do agree with your attorney, however, that in light of

your personal involvement that there is no good reason in this court's view to impose any consecutive sentencing on the other counts which are, essentially, derivative. Therefore, under *People* [v.] *Felix* which I've cited earlier and in light of the jury's findings in this matter, I am ordering you with respect to Counts Eleven and [Sixteen] to be committed to the Department of Corrections for the term of 15 years to life in each of those counts."

## 2. *Analysis*

Contrary to the statements of the trial court, the *Felix* case does not involve alternate penalty provisions, nor does it reference home invasion robberies or section 186.22. The opinion addresses how *enhancements* are applied to indeterminate sentences. (*Felix, supra,* 22 Cal.4th at pp. 654–659.) A term of imprisonment for life or a specified number of years to life is an indeterminate sentence for purposes of California's statutory sentencing scheme (§ 1170 et seq.). (*Felix, supra,* 22 Cal.4th at pp. 657–659.) The *Felix* opinion merely holds that *if* a trial court elects to impose consecutive sentences for two or more offenses that require indeterminate life terms, any enhancements attached thereto must be imposed for the full term of the enhancement, rather than one-third of the term as would ordinarily be done under the determinate sentencing laws. (*Id.* at pp. 655–656.)

Under section 669, a trial court has discretion to determine whether *to* impose sentences consecutively or concurrently. The existence of such discretion is explicitly recognized in the *Felix* opinion. (*Felix, supra,* 22 Cal.4th at p. 655 ["Whenever a person is convicted of two or more crimes, the court must impose either concurrent or consecutive sentences. (§ 669.)"].) The Legislature may remove this discretion for certain crimes, but exceptions are typically made clear in the statutory language of the offense. (See, e.g., §§ 667.6, subd. (d) [sex crimes committed under specified circumstances], 4501.5 [battery committed by a prisoner against a non-prisoner].) Unless otherwise prohibited by statute, sentences for crimes that carry indeterminate life terms may be imposed concurrently. "That the court's authority to impose either concurrent or consecutive sentences includes life sentences is made clear by further language in section 669, which provides: 'Life sentences, whether with or without the possibility of parole, may be imposed to run consecutively with one another, with any term imposed for applicable enhancements, or with any other term of imprisonment for a felony conviction.' " (*In re Maes* (2010) 185 Cal.App.4th 1094, 1099 [110 Cal.Rptr.3d 900].)

The trial court seems to have conflated two different provisions of section 186.22. Subdivision (b)(1) of the statute provides: "*Except as provided in paragraphs (4) and (5),* any person who is convicted of a felony committed

for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished [in accordance with subdivision (b)(1)(A), (B) or (C)] . . . ." (Italics added.) In contrast, subdivision (b)(4) of section 186.22 provides, in pertinent part: "Any person who is convicted of a felony enumerated in this paragraph committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, be sentenced to an indeterminate term of life imprisonment with a minimum term of the indeterminate sentence calculated as the greater of [¶] . . . [¶] (B) Imprisonment in the state prison for 15 years, if the felony is a home invasion robbery, in violation of subparagraph (A) of paragraph (1) of subdivision (a) of Section 213 . . . ."

■ As previously discussed, section 186.22, subdivision (b)(1) is an enhancement provision, while subdivision (b)(4) of the statute is an alternate penalty provision. (*Jones, supra,* 47 Cal.4th at p. 576; *People v. Briceno* (2004) 34 Cal.4th 451, 460, fn. 7 [20 Cal.Rptr.3d 418, 99 P.3d 1007].) The latter does not expressly require consecutive sentencing. Trial courts have discretion under section 669 to impose concurrent sentences for multiple convictions of crimes subject to the alternate penalty of 15 years to life under section 186.22, subdivision (b)(4)(B), and *Felix* does not hold otherwise.

Relief from a trial court's misunderstanding of its sentencing discretion is available on direct appeal when such misapprehension is affirmatively demonstrated by the record. (See *People v. Meloney* (2003) 30 Cal.4th 1145, 1151 [135 Cal.Rptr.2d 602, 70 P.3d 1023]; *People v. Fuhrman* (1997) 16 Cal.4th 930, 945 [67 Cal.Rptr.2d 1, 941 P.2d 1189].) Here, the trial court's repeated citation to *Felix,* combined with statements regarding its purported lack of discretion to impose anything other than consecutive sentences for the gang-related home invasion robberies, is most reasonably interpreted as confusion over the scope of its sentencing authority. Since the record does not conclusively show whether the trial court would have exercised its discretion to impose concurrent terms on the robbery convictions if it had known that it had such discretion, appellants are entitled to relief. (*People v. Gamble* (2008) 164 Cal.App.4th 891, 901 [79 Cal.Rptr.3d 612].) The appropriate remedy is a limited remand to give the trial court an opportunity to exercise its discretion under section 669 as to counts 9, 11, and 16. (*Gamble,* at p. 901; accord, *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8 [193 Cal.Rptr. 882,

667 P.2d 686]; *People v. Brown* (2007) 147 Cal.App.4th 1213, 1228 [54 Cal.Rptr.3d 887] ["Generally, when the record shows that the trial court proceeded with sentencing on the erroneous assumption it lacked discretion, remand is necessary so that the trial court may have the opportunity to exercise its sentencing discretion at a new sentencing hearing."].) On remand, the trial court shall exercise its discretion to run the sentences for these counts consecutively or concurrently, and state the reasons for its decision.[9] (Cal. Rules of Court, rule 4.406(b)(5).)

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments are affirmed in part and reversed in part. As to Rivas, the judgment is modified to reflect a conviction under count 4 of the lesser included offense of attempting to prevent a victim or witness from reporting a crime in violation of section 136.1, subdivision (b)(1). As to Centeno, Leon, Palofox, and Rivas, the judgments are modified to reflect convictions under count 13 of the lesser included offense of assault with a firearm in violation of section 245, subdivision (a)(2). Subject to these modifications, all convictions and all findings as to Centeno, Leon, Palofox, and Rivas are affirmed.

As to Centeno, the sentences imposed for counts 11, 13, 15, 16, and 18 are reversed subject to the conditions set forth herein. Centeno shall be resentenced for these counts on remand in a manner consistent with this opinion. As to Leon, the sentences imposed for counts 9, 11, 13, 15, 16, and 18 are reversed subject to the conditions set forth herein. Leon shall be resentenced for these counts on remand in a manner consistent with this opinion. As to Palofox, the sentences imposed for counts 11, 13, 15, 16, and 18 are reversed subject to the conditions set forth herein. Palofox shall be resentenced for these counts on remand in a manner consistent with this opinion. As to Rivas, the sentences imposed for counts 4, 8, 13, 15, and 18 are reversed subject to

---

[9] The transcript excerpts quoted above also reflect the trial court's consideration of a separate issue concerning whether it had discretion to strike the gang findings to circumvent the alternate penalty requirements of section 186.22, subdivision (b)(4). Similar questions are currently pending before the California Supreme Court. (*People v. Venegas*, review granted Dec. 10, 2014, S221923; *People v. Fuentes*, review granted Aug. 13, 2014, S219109.) We express no opinion on the issue, as it is not properly before us in this appeal. Remand on counts 9, 11, and 16 shall be solely limited to the court's discretion to impose consecutive or concurrent sentences.

*See footnote, *ante*, page 1003.

the conditions set forth herein. Rivas shall be resentenced for these counts on remand in a manner consistent with this opinion. In all other respects, the judgments are affirmed.

Hill, P. J., and Detjen, J., concurred.

A petition for a rehearing was denied January 28, 2016, and on January 19, 2016, the opinion was modified to read as printed above. The petitions of all appellants for review by the Supreme Court were denied April 13, 2016, S232355.